**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

COACH, INC., et al.,                    CASE NO.:  6:11-cv-01905-PCF-GJK

    Plaintiffs,

vs.

VISITORS FLEA MARKET, LLC, et al.,

    Defendants.
_____/

**DEFENDANTS, VISITORS FLEA MARKET, LLC AND DELROY JOSEPHS'
MEMORANDUM OF LAW AND RESPONSE IN OPPOSITION TO
COACH, INC. AND COACH SERVICES, INC.'S BRIEF IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, Visitors Flea Market, LLC (Flea Market) and Delroy Josephs (Mr. Josephs) (sometimes collectively "Defendants"), hereby files this its Memorandum of Law and Response in Opposition to Coach, Inc. and Coach Services, Inc.'s Brief in Support of their Motion for Summary Judgment.

**INTRODUCTION**

Coach, Inc. and Coach Services, Inc. (collectively "Coach") seek summary judgment against Visitors Flea Market, LLC and Delroy Josephs as to liability for Count I and Count V of the Complaint.  Coach's argument as to why these Defendants are liable relies primarily on three allegations: (1) that these Defendants knew that vendors in the Flea Market were selling counterfeit items; (2) that these Defendants "ignored the problem" for years; and (3) that these Defendants had an obligation to take "appropriate efforts" to "rid the market of counterfeits." All three allegations are flawed as provided herein and, therefore, Coach's Motion for Summary Judgment must be denied.

## **CORRECTING THE FACTUAL RECORD**

The central theme of Coach's argument as to why the Defendants should be liable in this matter is that these Defendants turned a blind eye to the alleged counterfeiting activity and did not care about counterfeit goods at the Flea Market. (Coach Brief at 5). In making this argument, Coach mischaracterizes one portion of Mr. Josephs' deposition testimony and completely ignores another. In his deposition, Mr. Josephs testified that he has been retired from the management of the Flea Market for several years, long before any of the allegations regarding counterfeiting at issue in this matter, and that due to health reasons he was unable to deal with the day to day stress of operations. (Josephs Dep. 54:17-25). Mr. Josephs testified that it was the severity of his medical condition, for which he is taking no less than ten different medications, which required him to totally relinquish management and control of the operations of the Flea Market, not a plan of willful blindness to the activities of the Flea Market. (Id., 30: 11-14, 55: 1-10, 78:1-11).

Mr. Josephs stated repeatedly that he believes the accusations of counterfeiting activity are serious, and that where a manufacturer such as Coach will identify a particular vendor selling counterfeit merchandise, and identify the merchandise that is counterfeit, he expects Mr. Waryas to evict that vendor. (Josephs Dep. 56:7-9, 65:1-2, 74:1-15, 78:1-18).

Coach argues that the "flea market is no stranger to counterfeiters," attempting to draw an impermissible inference that these Defendants must have had knowledge that the vendors named in this suit were selling counterfeit Coach items because the market has received letters from other manufacturers identifying possible counterfeit items. (Coach brief at 7). While Mr. Josephs identified the possibility of four to ten letters that may have been directed to the Flea Market in the twelve years it has operated, this testimony is irrelevant as to the issue of notice to

the Defendants, and the requisite concurrent knowledge of alleged counterfeit **Coach** items. Coach further attempts to bootstrap Western Anti-Counterfeiting Coalition ("WAAC") notices given to vendors in 2008 and 2010 respectively as evidence of the Defendants' knowledge of the alleged counterfeiting of Coach items in 2011.  These notices do not reference any Coach items and are irrelevant to the issues in this matter and thus cannot be considered.  While Mr. Rosaler testified in his deposition that he observed allegedly counterfeit Coach items at the Flea Market in 2008, the summary of Mr. Rosaler's deposition testimony regarding his investigation can be stated as follows:  (1) his report did not any reference to Coach items, (2) he had no recollection as to how many allegedly counterfeit Coach items he observed, he did not recall vendors who allegedly possessed counterfeit items, or even how many, (3) he didn't talk to any of the vendors, and (4) he didn't remember identifying any items bearing Coach marks to Mr. Waryas or any person he believed to be an employee of the Flea Market.  (Rosaler Dep. 11:19-24, 14:20-25, 15:1-25, 16:1-2).  Mr. Rosaler's 2010 investigation is equally bereft of any evidence of notice to the Flea Market or Mr. Josephs of any allegedly counterfeit Coach items.

       The first record evidence of any attempted "notice" by Coach to the Flea Market of vendors allegedly trafficking in items bearing Coach marks is the letter of March 28, 2011. Noticeably absent from the letter is reference to any specific vendor, at any specific booth or any specific mark on any specific item.  In short, it was not notice.  Coach then argues that Josephs never gave the order to evict anyone, "deliberately electing to continue to capitalize on the attendance revenues that the vendors continued to draw."  (Coach Brief at 10).  This argument improperly infers that Mr. Josephs, who has not been notified of any vendor who is allegedly selling counterfeit merchandise, is obligated to evict the "one or more tenants," vaguely referred to in the March, 2011 letter, and falsely claims that the motive for failing initiate eviction

3

proceedings was to "capitalize on attendance revenues," knowing full well that the Flea Market did not charge patrons of the market an admission fee, and consequently there were no attendance revenues. (Waryas Dep. 28:21-22).

Coach next argues that these Defendants were given sufficient notice of alleged counterfeiting activity in the Flea Market because on August 5, 2011, Mr. Rosaler conducted another sweep on the market and identified counterfeit items and delivered cease and desist letters to individual vendors. (Coach Brief at 10). Although the letters are addressed to the vendors, Mr. Rosaler claims that he delivered the letters with "market security," and left copies with Ms. Vindrawatie Daharry (Ms. Daharry), an administrative assistant in the Flea Market office. (Rosaler Dep. 28:12-25, 29:1-25). This testimony is contradicted by the record in that the Flea Market did not employ "market security" or any person described by Mr. Rosaler, and Ms. Daharry states that she was never provided with copies of the cease and desist letters described by Mr. Rosaler. (Josephs Dep. 46:8-11, Waryas Dep. 48:14-15, Daharry Decl. ¶3). In fact, Ms. Daharry could not have been provided, nor made copies of the documents as Mr. Rosaler has testified because she was not present at the flea market on Friday, August 5, 2011; Ms. Daharry has not worked at the flea market on a Friday since at least 2005. (Ms. Daharry Decl.¶4,5). Lastly Coach identifies the November 19, 2011 raid as evidence of liability of these Defendants. However, neither the Flea Market employees nor Mr. Josephs has ever been contacted by any agent from Immigration and Customs Enforcement ("ICE") identifying any vendor of the Flea Market as trafficking in counterfeit Coach merchandise, or any counterfeit merchandise at all, and no vendor was ever arrested. (Waryas Dep. 166:4-23, 175:1-5).

Coach's last line of argument is that these Defendants did nothing to stop the alleged criminal behavior of the vendors. Coach asserts that the Flea Market permitted vendors to

4

purchase counterfeit Coach items in its parking lot. (Coach Brief at 12). There is no record evidence that any employee of the Flea Market, or Mr. Josephs was even aware that this alleged activity was occurring. Likewise, Coach argues that the Flea Market never took steps to educate its personnel on detecting counterfeit Coach products. (Id.). Not only is this statement untrue, because Mr. Waryas did attempt to educate himself, but it turns out that is not possible for flea markets to adequately obtain the information Coach suggests. (Coach 30(b)(6) Dep. 66: 12-16). Mr. Waryas testified that after receiving Coach's letter of March 28, 2011, he attempted to educate himself by visiting Coach's website as directed, however, unlike the deposition testimony and declarations of Coach's witnesses which identify specific features such as stitching or specific marks coupled with corresponding content and style, the website does not identify such specifics and therefore does not prove useful in providing any training on how to detect authentic verses counterfeit Coach items. (Waryas Dep. 53: 21-23, 106:20-23). After November 19, 2011, the Flea Market contacted Coach through its counsel to ask for assistance in identifying counterfeit items, and invited Coach to its premises to assist in conducting a search. (Exhibit 23 Waryas Dep.). Coach refused to assist the Flea Market by sending a representative to the market to provide assistance to management, even though Coach did send an agent on three prior occasions in its efforts to conduct investigations. (Exhibit 7 Coach 30(b)(6) Dep.). Coach does provide extensive training to investigators, attorneys and law enforcement agents as to how to distinguish authentic verses counterfeit merchandise, but refuses the same training to flea market operators. (Perez Dep. 35:23-25, 36:1-25, 37:1-17).

Coach makes reference to the Flea Markets rules and argues that no measures were implemented to enforce the rules. (Coach brief at 13). Coach states that the Flea Market's ban of any Coach items is "illusory," that no signs have been posted and despite the "sweeps and raids,"

vendors that have admitted that merchandise they were selling in the past was counterfeit have not been evicted. (Id.). But the fact of the matter is, that the sweeps conducted by Mr. Rosaler did not result in notification by Coach to the Defendants of specific alleged infringing activity of Coach merchandise, there was only one raid, not multiple as indicated by Coach, and it did not result in arrests by the authorities or subsequent notification of infringing specific vendors and infringing merchandise. And despite Coach's refusal to provide any meaningful help, there is no evidence of continued alleged infringing activity after November 19, 2011, as argued by Coach.

## **LEGAL ARGUMENT AND POINTS OF AUTHORITY**

For contributory liability for trademark infringement to attach, one of two things must happen: (1) under *Tiffany (NJ) Inc. v. Ebay, Inc.*, 600 Fed 3rd 93 (2d Cir. 2010), a defendant must have "contemporary knowledge" of "particular" infringements, and do nothing about them; or (2) under *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060 (2011), a defendant must take "deliberate actions" to avoid learning of those infringements. In this case, the Flea Market and Mr. Josephs had no contemporary knowledge of particular infringements, and took no deliberate actions to avoid learning of particular infringements. In its brief, Coach sites to *Hard Rock Café Licensing Corp. v. Concession Svcs., Inc.* 955 Fed. 2d 1143, 1148 (Seventh Cir. 1992), and argues that a defendant's willful blindness is equivalent to actual knowledge for purposes of the Lantham Act (Coach Brief at 21). Coach then states that the court in *Hard Rock* held that to be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate. (Coach Brief at 21*).* Coach then goes on to explain that the case was remanded to the trial court for purposes of applying the correct legal standard, but Coach never identifies the correct legal standard. (Id.) After setting forth the standard for willful blindness identified above, the Seventh Circuit vacated the lower court's decision and found error in the District

6

Court's application of the willful blindness standard. See *Hard Rock Café* at 1149. The Appellate Court found that the District Court "made little mention of [the defendant]'s state of mind and focused almost entirely on [the defendant]'s failure to take precautions against counterfeiting." (Id.) The District Court thus erred by applying a standard of knowledge more akin to negligence than willful blindness. A defendant "has no affirmative duty to take precautions against the sale of counterfeits. Although the 'reason to know' part of the standard for contributory liability requires [the defendant] to understand what a reasonably prudent person would understand, **it does not impose a duty to seek out and prevent violations**." (Id.). (emphasis added) Coach relies heavily on *Coach, Inc. v. Gata Corp.*, No. 10-cv-141, 2011 WL 2358671 (D. N.H. June 9, 2011), where the court granted summary judgment on a contributory trademark infringement claim. However, the facts of that case are distinguishable from the case at bar. In *Gata*, the flea market at issue had been raided by law enforcement on at least four occasions. (Id.) at *4. Also, a private investigator visiting the flea market overheard one of the defendant's employees telling "a vendor with counterfeit merchandise on display that such goods had to be kept under the table rather than out in the open." (Id.) at *5. Furthermore, the defendants there repeatedly identified and confiscated counterfeit goods from the vendors. Finally, there was no evidence that the defendants in *Gata* ever sought any advice or training on how to identify counterfeit Coach goods, unlike Mr. Waryas who visited Coach's website and specifically asked Coach for help in identifying counterfeit merchandise. As evidenced by the extensive training that Coach gives its agents, members of law enforcement, and attorneys, in identifying authentic versus counterfeit items, clearly the Defendants could not have the requisite knowledge to be held liable for contributory trademark infringement as suggested by Coach. This fact is all the more buttressed by Coach's argument in its Brief that the items at issue are

"identical to, or substantially indistinguishable from, the Coach trademarks". If the items at issue, are identical to authentic items as suggested by Coach, and thus likely to cause confusion to the consuming public, how would the Flea Market or Mr. Josephs have the ability to distinguish authentic from counterfeit items without assistance from Coach or any other trained expert? Coach argues that the *Gata* court noted counterfeit purses to be distinguishable based on price, however in its deposition Coach stated that "price is never a sole indicator of authenticity." (Coach 30(b)(6) Dep. 66: 3-4). Simply put, Coach admits that just because an item bearing a Coach mark is bought at a flea market, that does not mean it is counterfeit. (Coach 30(b)(6) Dep. 71: 8-22).

Coach goes to great lengths to identify multiple steps that the Defendants failed to take in response to a letter received by Coach. Coach Brief at 27. However, Coach never provides law which identifies such a duty to act. However, as stated above, flea market owners have no such affirmative duty to police their markets. See *Hard Rock* at 1149, see also *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1271, 1275 (S.D. Fla. 2002) ("[T]he doctrine of contributory liability does not impose an affirmative duty on a manufacturer or distributor to seek out and prevent violations or take precautions against the sale of counterfeit product.").

Coach's argument for liability of the Defendants as to copyright infringement, either contributorily or vicariously, must also fail. To establish contributory copyright infringement, Coach must prove that the Flea Market and Mr. Josephs (1) knew or had reason to know of the copyright infringement of vendors at the Flea Market, and (2) induced, caused or materially contributed to that infringement. *Casella v. Morris*, 820 F. 2d 362, 365 (11th Cir. 1997). As to the knowledge requirement, there is no record evidence to support the allegation that the Defendants knew or had reason to know about Coach's copyrights or any infringement thereof.

Indeed, Coach does not even make allegations that Defendants knew of the copyrights it claims to have been infringed upon, but rather merely argues liability on alleged intentional infringement by the Flea Market vendors. (Coach Brief at 29). The only letter sent by Coach to Visitors Flea Market alleging infringing activity references only trademarks and a potential liability of the Lantham Act. (Exhibit 3 Coach 30(b)(6) deposition). The record is entirely devoid of any evidence that the Flea Market and Mr. Josephs were notified by Coach of any copyright or infringement thereof. In order to prevail on its claim, Coach must demonstrate that it provided the necessary documentation to show that there was a likelihood of infringement. *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1106 (N.D. Cal. 2006) (quoting *Religious Tech Ctr. v. Netcom Online Communication Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal 1995). Coach further argues that the Flea Market had the ability to inspect its vendors merchandise and remove a vendor for having infringing merchandise, and therefore demonstrated the requisite level of control in order to be held liable for infringing activity. (*Coach Brief* at 29). However, Coach fails to explain how the Defendants were supposed to control copyright infringements that they could not identify in the first place. See, e.g., *Adobe Sys., Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1055 (C.D. Cal. 2001) ("there can be no practical ability to control the infringing behavior if national does not know what constitutes an unauthorized Adobe product."). Having the "ability" to contractually seek an eviction for alleged infringing conduct requires the ability to identify infringing merchandise.

Coach further argues that the Flea Market had a direct financial interest in the sale of counterfeit merchandise and therefore benefited financially from the sale of counterfeit merchandise by vendors, causing it to be vicariously liable for copyright infringement. As the basis for this conclusory statement, Coach argues that the Flea Market admitted that it continued

to collect rent from vendors it knew had admitted to selling counterfeit merchandise. This argument is factually misleading however, because it was not until the depositions taken in this case that a vendor "admitted" to selling counterfeit merchandise. There is no evidence that at the time the deposition was taken that any counterfeit Coach merchandise was being sold by the vendor. Coach does not cite to any case law which stands for the proposition that a flea market receives a "direct financial benefit" in the sale of counterfeit merchandise from any vendor that it discovers has sold counterfeit merchandise ever, whether contemporaneous with the alleged infringing merchandise or not. Where a defendant rents space or services on a "fixed" rental fee that does not depend on the activity of the lessee, courts typically find no vicarious liability because there is no "direct" financial benefit from the infringement. See *Religious Tech Ctr.* Supra at 1376.

Coach seeks to hold Mr. Josephs personally liable for contributory trademark infringement and contributory and/or vicarious copyright infringement. In order to hold Mr. Josephs personally liable for the Flea Market's alleged contributory and vicarious trademark/copyright infringement, Coach must show that Mr. Josephs was the "moving, active, conscious force who caused the infringement." *Chanel, Inc.*, 931 F. 2d at 1478 N. 8 (11th Circuit 1991). "The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Id.* At 1478 n.8 (emphasis added). Courts have held that individual defendants were not personally liable where they were not connected to the purchase or promotion of the alleged counterfeit items in question. *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, No. 09-615910-Civ, 2010 WL 2266023, *5 (S.D. Fla. June 4, 2010); *Rolex Watch U.S.A., Inc. v.*

*Bonney*, 546 F. Supp. 2d 1304, 1306 (M.D. Fla. 2008); *Arista Records, Inc. v. Flea World, Inc.*, Civil Action No. 03-0276 (JBS), 2006 WL 842883, *18 (D.N.J. Mar. 31, 2006).

Applying the aforementioned precedent, it is clear that there have been no allegations or supporting record evidence that Mr. Josephs was a "moving, active, conscious force" behind the decisions of vendors at the flea market as to any specific items they sold, much less allegedly counterfeit items. Mr. Josephs did not purchase or sell any allegedly counterfeit items himself, or instruct others to do so. *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 914 (E.D.N.Y. 1988) (finding individuals liable where they personally directed the purchase of counterfeit items).

Coach cites to several cases which it claims stand for the proposition that an individual can be liable for the contributory or vicarious infringement of a corporation that individual has an ownership interest in. For example, Coach cites to *Babbit Elecs, Inc. v. Dynascan Corp.*, 38 F. 3d 1161, 1184 (11th Cir. 1994), however, unlike the facts of this case, the individuals in *Babbit* that were found to be liable for infringing conduct, were each personally involved in the unauthorized purchase and sale of the alleged infringing products. Likewise, in *Microsoft Corp. v. Moss*, 2007 U.S. Dist. Lexis, 73672 (N.D. Ga.), (Sept. 20, 2007), the individuals in that case each directly supervised the activity and directly controlled the employees of the company engaged in infringing activity. One individual "personally participated in the infringement" when she sold merchandise loaded with illegal infringing software. (Id. *6). In *Mead Johnson & Co. v. Babies Formula Service, Inc.*, 402 F. 2d 23 (5th Cir. Fla. 1968), the individuals in that case violated the terms of an injunction by continuing to personally sell products which the trial court had adjudged to be an infringement of a trademark in which the court had ordered destroyed. In *Polo Fashions, Inc. v. Branded Apparel Merchandising, Inc.*, 592 F. Supp. 648,

652-53 (D. Mass. 1984), the individual held liable for his acts was personally selling t-shirts which were found to be infringing on a protected mark.

In each of the examples cited by Coach, the courts have found that there is direct involvement in the alleged infringing activity prior to holding an individual liable for corporate acts. The evidence before this Court is overwhelmingly demonstrative of the fact that Mr. Josephs, who had been retired out of the country for many years prior to any alleged infringing conduct in this matter, was not the moving and driving force behind any alleged counterfeit activity and, therefore, cannot be held liable individually.

## CONCLUSION

Coach has failed to demonstrate that these Defendants knew that vendors in the flea market were selling counterfeit items, that these Defendants took active steps to ignore alleged counterfeiting activity, and that these Defendants have an obligation but failed to take "appropriate efforts" with respect to Coach's vague allegations of alleged infringing activity. Therefore, Coach's Motion for Summary Judgment must be denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 12, 2012, I electronically filed the foregoing with the Clerk of the Courts by using the ECF system, which will send a notice of electronic filing to the following: **Douglas Goldin, Esquire**, Broad and Cassel, 390 E. Orange Avenue, Suite 1400, Orlando, FL 32801; and **David B. Rosemberg, Esquire**, Broad and Cassel, 2 S. Biscayne Blvd., 21st Floor, Miami, FL 33131. I further certify that I mailed the foregoing

document and notice of the electronic filing, by first class mail, to the following non-ECF participant:  **Julio Batista**, 1189 Epson Oak Way, Orlando, FL 32837.

*s/ Rodger D. Moss, Jr.*
_____
Rodger D. Moss, Jr., Esquire
Florida Bar No.: 0153915
ZIMMERMAN, KISER & SUTCLIFFE, P.A.
315 E. Robinson St., Suite 600 (32801)
P.O. Box 3000
Orlando, FL  32802
Telephone:  (407) 425-7010
Facsimile:   (407) 425-2747
Counsel for Defendants, Visitors Flea Market, LLC
and Delroy Josephs